**Edward BONILLA, Petitioner,**

v.

**Robert HOKE, Superintendent, Eastern Correctional Facility, Respondent.**

**No. 89 Civ. 3451 (TPG).**

United States District Court,
S.D. New York.

Sept. 5, 1991.

Edwin Bonilla, pro se.

Allen H. Saperstein, Asst. Dist. Atty., Bronx, N.Y., for respondent.

## OPINION

GRIESA, District Judge.

This is a habeas corpus petition by a state prisoner. Respondent has answered the petition. The issue raised in the petition depends upon the record at the crimi-

nal trial of petitioner, together with legal arguments. No hearing is necessary.

The court rules that petitioner is not entitled to habeas corpus relief, and the petition is dismissed.

Petitioner Edward Bonilla was convicted on two counts of second degree murder and one count of first degree robbery after a jury trial in Supreme Court, Bronx County. On May 18, 1983 Bonilla was sentenced to concurrent terms of 22 years to life and 6–18 years.

Bonilla appealed to the Appellate Division, First Department, which affirmed the conviction without opinion on April 1, 1986. 119 A.D.2d 1013, 500 N.Y.S.2d 216. The New York Court of Appeals denied leave to appeal on June 10, 1986.

The issue raised on this habeas corpus petition was the principal issue raised on his appeal to the Appellate Division—whether petitioner's constitutional right of confrontation was denied because of the admission of post-arrest statements of his two co-defendants. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

State Trial Court Proceedings

*Bonilla's Severance Motion*

The case arose out of the murder of a photographer named Mario Zamora during the night of July 21–22, 1981. Bonilla was tried along with two co-defendants, Luis Colon and Richard Gordon. Gordon and Colon had given statements to the police implicating all three defendants in the murder. Bonilla had given no statement to the police. However, the evidence proposed to be introduced by the People included testimony by Hereberto Rosario and Angel Rivera that Bonilla had admitted to them his role in the murder, describing the incident in considerable detail.

Prior to the trial, Bonilla, Gordon and Colon made motions for severance on the ground that the introduction of the various statements at a joint trial would violate the *Bruton* rule. Bonilla's motion is recorded at pp. 519–525 of the minutes of the pretrial hearing. The attorney for the People argued that *Bruton* did not apply because

the confessions were interlocking. Bonilla's attorney accepted the proposition that there was an exception to the *Bruton* rule in the case of interlocking confessions (*see Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979)), but argued that as a matter of fact there was no interlocking here (p. 520). The court denied all the severence motions. As to Bonilla's motion, the court ruled that the statements of Gordon and Colon did not implicate Bonilla beyond the manner in which he implicated himself in his own statements to Rosario and Rivera (p. 537).

*Evidence at Trial*

Hereberto ("Eddie") Rosario testified that at about 8:00 P.M. July 21, 1981 he heard Bonilla and Luis Colon discuss stealing some cameras from Zamora and saying that they were planning to kill him (TR 182–187).

Angel Rivera testified that at about 9:00 P.M. the same evening he and his girlfriend, Gladys Ayala (referred to elsewhere as Gladys Rivera), were sitting on a park bench. Bonilla came up to them, took Angel Rivera aside and asked him if he knew where Bonilla could find a gun, since Bonilla "wanted to rip some guy off with some cameras and equipment." Rivera answered in the negative (TR 117–118).

David Aquila testified that at about 10:00 P.M. that evening Bonilla asked him if he knew where Bonilla could get a pistol "so he could rip someone off." Bonilla told Aquila that it was "Mario a photographer." Aquila answered he did not know about getting a pistol (TR 278).

Angel Rivera further testified that he encountered Bonilla at about midnight. Bonilla was carrying a black shoulder bag and said: "... we just killed this guy. I have blood all on my hands and socks" (TR 118–119). At this point Rivera's girlfriend Gladys got nervous and went home. Bonilla sat down with Rivera and told Rivera what had happened that night (TR 120–122). Bonilla said that he and his companions had gone to Mario's house. After some conversation Bonilla turned off the lights and Gordon hit Mario, knocking him to the ground. Bonilla had two knives.

He gave one to Gordon. They stabbed Mario repeatedly. However, Mario was not dead. Bonilla found a "police fox pole," and stabbed Mario in the throat two or three times. Then they went to the bathtub and put the knives into a tub full of water. They tried to wipe the fingerprints off the weapons, and tried to clean up themselves. Bonilla told Rivera that while he and Gordon were stabbing Mario, Colon had panicked and gone off to the side.

Rivera further testified that he spoke to Bonilla two or three days later, and Bonilla repeated the story of his participation in the murder of Zamora (TR 125).

Rosario testified that he was at a party early one Sunday morning in July 1981. At the end of the party, at about 4:00 A.M., he had a conversation with Bonilla. Both had been drinking beer. Bonilla told Rosario what had happened with Mario Zamora, and that "they" had killed him (TR 193–197). Bonilla said that they went to Mario's house and that Bonilla had given a signal by turning off the lights. Then Gordon hit Zamora, and then they started stabbing Mario. Bonilla used one knife and Gordon used the other knife. Bonilla also stabbed Mario in the neck and groin with a "police bar." In addition to Bonilla, Colon and Gordon, someone named Elvin was present, but Elvin ran out (TR 193–197).

Zamora's body was discovered by two women who called the police. When the police arrived they found that Zamora had been the victim of multiple stab wounds. The bathtub was half filled with reddish tinted water which contained two knives and a "police fox lock."

Detective Donald Scheppert testified that Colon was arrested on July 29, 1981, and that Colon gave a statement to the police that day. Scheppert made a written record of that statement. Scheppert testified orally as to that statement and also read the written statement, which was received into evidence as People's Exhibit 16. The statement of Colon was that on the afternoon of July 21 Bonilla approached Colon and stated that he needed money. Later in the afternoon Bonilla approached Colon and

asked if he wanted to do a robbery with him, stating that he intended to rob Mario and "to take him off the count," meaning kill him. Later that evening Bonilla, Colon, Gordon and Elvin Orsini went to Mario Zamora's apartment. After a short time Gordon threw Zamora to the ground. Orsini ran out. Colon saw Bonilla standing with a knife. Then they found property and left the apartment. Colon found Orsini. Bonilla, Colon, Gordon and Orsini went to an apartment in a housing project and divided the stolen property (TR 521–527, 531–538).

Bonilla's attorney objected to the written statement as not binding upon Bonilla (TR 529). The court overruled the objection, and instructed the jury that the evidence about Colon's statement could be considered only as to Colon, and could not be considered with respect to Bonilla or Gordon (TR 529–530).

Detective Scheppert testified that Gordon was arrested on August 4, 1981, and that Gordon gave the police a statement that day. Scheppert made a written record of that statement. Scheppert testified as to what Gordon told him and read the written statement, which was received as People's Exhibit 17. The statement of Gordon was that about two weeks earlier he was approached by Bonilla and Colon. Bonilla asked Gordon about obtaining a gun. Gordon said that he could not help. Later that evening Bonilla saw Gordon again and asked for help in getting a gun. Gordon again gave a negative response. Bonilla asked if Gordon wanted to do a robbery with him, which Gordon agreed to. Bonilla said he would meet Gordon in a half hour. Subsequently, Gordon met Bonilla, Colon and Orsini and they went to Mario's apartment. Gordon threw Mario to the ground. Orsini held Mario. Bonilla knocked over the light and it got dark. Bonilla said to kill Mario, and Gordon said that he didn't have anything to do it with. Bonilla left the room, came back and gave Gordon a knife. Gordon stabbed Zamora twice in the side. At this time Orsini left. Bonilla brought another knife into the room and asked Colon to kill Zamora. Colon left the room. Zamora was still alive and protest-

ing. Bonilla started stabbing Zamora, but Zamora still did not die. Bonilla left the room, came back with a bar, and stabbed Zamora three times in the throat. Zamora stopped breathing. They assembled some property. Gordon then brought the knives and the bar into the bathroom and put them into the tub. Gordon cleaned up his person, and he and Bonilla left the apartment. They then met Colon outside and found Orsini later. The four went to an apartment and divided the property (TR 560–566, 570–576).

The court instructed the jury that the evidence about Gordon's statement could be considered only as to Gordon, and could not be considered with respect to Bonilla or Colon (TR 577).

In the defense case, Orsini was called by Bonilla's attorney. He admitted going to Zamora's apartment with Bonilla and Colon (TR 890). Gordon was also there (TR 892). At some point the lights went off. A figure "just toppled down" in the dark, and then "somebody was on him." Orsini could not see who it was. Orsini ran out and Bonilla ran out right behind him (TR 893–894). Orsini did not see Bonilla with a knife in his hand or with a police lock bar in his hand, nor did he see Bonilla strike or punch Zamora (TR 894–895). In fact, Orsini did not see anyone strike Zamora (TR 910–911). When confronted by the People's attorney on cross-examination with testimony on a prior occasion that he had seen "a punch right in the face," he admitted giving that answer. He also admitted testifying on a prior occasion about Gordon punching Zamora, but then testified on further cross-examination that he saw "a shadow move toward Zamora" (TR 912–913).

Bonilla testified in his own defense. He admitted going to Zamora's apartment on July 21, 1981 with Colon, Gordon and Orsini (TR 1028, 1042). According to Bonilla, the purpose of the visit was for him to pick up a portfolio of four photographs which Zamora had taken (TR 1028–1029). Bonilla testified that while he was talking to Zamora, "someone came up, hit him and the lights went off" (TR 1033). Bonilla saw "a

figure" hit Zamora (TR 1045). Later he stated that he saw "a hand" hit Zamora (TR 1053). Then Bonilla ran out after Orsini (TR 1033–1034). Bonilla denied stabbing or punching Zamora, and denied seeing Colon or Gordon do any of these things (TR 1032–1033). He denied taking any property belonging to Zamora (TR 1034).

Bonilla denied telling Angel Rivera, Eddie Rosario, Gladys Rivera or David Aquila that he planned "to do a geese" or to do a rip off. He denied telling any of them that he had killed Zamora or had anything to do with Zamora's death. Bonilla denied telling any of these people that Gordon or Colon had anything to do with the death of Zamora (TR 1035).

## DISCUSSION

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Bruton's conviction was reversed on the ground that he had been denied his Sixth Amendment right of confrontation when a postal inspector was allowed to testify that his co-defendant had confessed to having committed the crime with Bruton. The co-defendant did not testify and was thus not subject to cross-examination. The Court ruled that the trial judge's instruction to the jury not to consider the co-defendant's confession against Bruton was not sufficient protection; the risk that the jury could not give proper effect to that instruction was too great.

In *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), eight justices participated. The plurality opinion by four justices (Justice Rehnquist joined by Chief Justice Burger and Justices Stewart and White) held that *Bruton* does not apply where the defendant claiming violation of Sixth Amendment rights has himself confessed and his confession "interlocks" with and supports the confession of his co-defendant. Four justices disagreed with the idea that interlocking confessions created an exception to the *Bruton* rule. This disagreement was expressed in two opinions, one by Justice Blackmun, and the other by Justice Stevens joined by Justices Brennan and Marshall.

The Supreme Court revisited the issue in *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). In a 5–4 decision, the Court decided that there was no interlocking confession exception to *Bruton*. The decision was handed down on April 21, 1987.

Bonilla's trial in 1983 occurred during the time when *Parker* represented the voice of the Supreme Court. Although the interlocking confession rule was adopted only by a plurality opinion of four justices, that opinion was authoritative as far as trial courts in this country were concerned. *See Reddy v. Coombe*, 916 F.2d 47, 50 (2d Cir. 1990) ("interlocking confession exception established by *Parker v. Randolph*"). Moreover, Bonilla was tried in the State of New York and the federal court of appeals in this area had accepted the interlocking confession rule for many years. *United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45, 48–49 (2d Cir.), *cert. denied*, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *United States ex rel. Catanzaro v. Mancusi*, 404 F.2d 296, 300 (2d Cir.1968), *cert, denied*, 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970). The *Cruz* case was not decided until four years following the Bonilla trial. Indeed, the appellate proceedings in the Bonilla case were completed prior to the decision in *Cruz*.

▆ Bonilla argues that *Cruz* should be applied retroactively. The Supreme Court has held that a new rule of constitutional interpretation will not be applied retroactively in collateral attacks on state criminal cases, unless the rule falls within one of two exceptions. *Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 1216–18, 108 L.Ed.2d 347 (1990); *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 1263–64, 108 L.Ed.2d 415 (1990); *Gilberti v. United States*, 917 F.2d 92, 95–96 (2d Cir.1990). The first exception is where the new rule places certain kinds of conduct beyond the power of the criminal law-making authority to proscribe. *Butler*, 110 S.Ct. at 1218; *Saffle*, 110 S.Ct. at 1263. The second exception is for watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceed-

ing. *Saffle,* 110 S.Ct. at 1263; *see also Butler,* 110 S.Ct. at 1218.

Some federal district courts have held that *Cruz* announces a new rule which should be applied retroactively. *Fernandez v. Leonardo,* 742 F.Supp. 55 (E.D.N.Y.1990), *rev'd on other grounds,* 931 F.2d 214 (2d Cir.1991); *Reddy v. Coombe,* 730 F.Supp. 556 (S.D.N.Y.), *aff'd on other grounds,* 916 F.2d 47 (2d Cir. 1990). The Second Circuit in the *Reddy* case reviewed a habeas corpus ruling raising the issue of the retroactivity of *Cruz.* The court of appeals found it unnecessary to rule on this issue since it held that the petition should be granted for other reasons. *Reddy,* 916 F.2d at 50–52.

It is the view of this court that *Cruz* should not apply retroactively. When a five-member majority of the Supreme Court in *Cruz* disagreed with the four-member plurality opinion in *Parker,* this was not a watershed ruling establishing a basic new standard on which the fundamental fairness and accuracy of criminal trials would rest. It is quite apparent that the interlocking confession issue involves a close question relating to a fine point regarding the application of the basic rule in *Bruton.* There are obviously cogent arguments for and against each side of the issue, as illustrated by the opinions of the justices of the Supreme Court who have spoken on the question and the close votes that have occurred in that court.

Serious practical considerations argue against the retroactive application of *Cruz.* In preparation for the trial of Bonilla and his co-defendants in 1983, the lawyers and the trial judge needed to know what rule of law they should apply. This was a case where a joint trial of the three defendants was obviously appropriate, unless the *Bruton* rule mandated otherwise. The Second Circuit, however, had adopted the interlocking confession rule, which had received the sanction of the plurality opinion in *Parker.* There can be no question about the fact that the various confessions were interlocking. The trial judge properly applied the rule and held a single trial at which the

statements were admitted into evidence with appropriate limiting instructions.

Even if *Cruz* were deemed to apply retroactively, Bonilla would not win his writ of habeas corpus. The law is that a violation of *Bruton* will not result in the overturning of a criminal conviction where the violation is harmless error. In order to allow a conviction to stand in such a case, the court must be able to declare its belief that the error was harmless beyond a reasonable doubt. *Cruz,* 481 U.S. at 194, 107 S.Ct. at 1719; *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

The present case presents a situation where any *Bruton* violation was harmless error beyond a reasonable doubt.

Two witnesses—Rosario and Rivera—testified that Bonilla admitted to them his participation in the killing of Zamora. Bonilla's statements to Rosario and Rivera described in great detail the use of knives by Bonilla and Gordon to stab Zamora, and the use of the pole or bar by Bonilla to finish the killing by stabbing Zamora in the throat. According to these witnesses, Bonilla further described how the weapons were put into water in the bathtub.

Rosario and Rivera gave further evidence in addition to telling about these post-murder statements by Bonilla. Rosario testified that he had heard Bonilla and Colon talking about a plan to steal cameras from Zamora and to kill him. Rivera testified that Bonilla had asked Rivera if he knew where a gun could be obtained since Bonilla wanted to steal some cameras and equipment from someone.

Aquila also testified that Bonilla asked where he could get a pistol so that he could rob Zamora, a photographer.

The physical evidence meshed closely with the testimony of these witnesses. Zamora's body was found with multiple stab wounds. Also, the bathtub in Zamora's apartment contained water obviously tinted with blood, as well as two knives and a police fox lock.

Bonilla's testimony in his own defense can only be viewed as fatal to his case

because of its utter implausibility. He testified that he had gone to Zamora's apartment to pick up four photographs. Although he admitted that his three companions accompanied him, no explanation was given as to why all these people were needed to retrieve a small group of pictures. Also, Bonilla admitted witnessing a violent blow to Zamora, but simply described it being done by "someone"—"a figure"—"a hand." Orsini also gave the story of "somebody" attacking Zamora, testimony which was impeached when he was confronted with a prior statement about Gordon punching Zamora. Orsini's final version was that he saw "a shadow" going after Zamora.

The jury quite obviously viewed the testimony of Bonilla and Orsini as crude fabrications. These falsehoods only served to reinforce the testimony of the three witnesses that they had heard inquires by Bonilla in the course of his planning the robbery and murder, and the further testimony by two of these three witnesses that Bonilla had admitted the details of the murder after it had been committed. All this, together with the physical evidence, was overwhelming proof of Bonilla's guilt.

We now turn to the confessions of Colon and Gordon. These co-defendants did not, of course, testify themselves. Their statements were admitted through the testimony of Detective Scheppert. The court instructed the jury that these statements could be used only against the persons making them. Thus, according to the instructions of the court, neither statement could be used against Bonilla. The *Bruton* case recognizes the substantial risk that a jury might not be able to follow such an instruction.

In the present case, however, the evidence of Bonilla's guilt was overwhelming without any spillover that may have occurred from the Colon and Gordon confessions. One thing to be considered is the fact that the three witnesses who testified about Bonilla's admissions of guilt were live witnesses subject to cross-examination. It is safe to infer that the impact of these witnesses was of a magnitude considerably greater than that of the statements of Colon and Gordon, which were presented to the jury in a secondhand version.

## CONCLUSION

The court concludes that there was no violation of the *Bruton* rule, since the interlocking exception was the law at the time the state court proceedings occurred. Even if there was a violation of *Bruton* because the *Cruz* ruling should be applied retroactively, nevertheless such violation was harmless beyond a reasonable doubt.

The petition for a writ of habeas corpus is dismissed.

SO ORDERED.