

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-19-1995

# Flamer v State of DE

Precedential or Non-Precedential:

Docket 93-9000

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Flamer v State of DE" (1995). *1995 Decisions.* Paper 273.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/273

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
─────────────

No. 93-9000
─────────────

WILLIAM H. FLAMER

v.

STATE OF DELAWARE, DARL CHAFFINCH,
RAYMOND CALLAWAY, HAROLD K. BRODE,
WILLIAM H. PORTER, GARY A. MYERS,
LOREN C. MEYERS, DANA REED, JAMES E.
LIGUORI, CHARLES M. OBERLY, III,
WALTER REDMAN, STANLEY W. TAYLOR, Acting Warden;
WARDEN ROBERT SNYDER

William Henry Flamer

Appellant

─────────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
(D.C. Civil No. 87-00546)
─────────────────────────

Argued:  February 16, 1994
Before:  BECKER, HUTCHINSON,* and ALITO, <u>Circuit Judges</u>

(Opinion Filed: October 19, 1995)

─────────────────────────

CHARLENE D. DAVIS, ESQ. (Argued)
Bayard, Handelman & Murdoch, P.A.
902 Market Street, 13th Floor
P. O. Box 25130
Wilmington, DE  19899

JOSHUA L. SIMON, ESQ.
Law Office of David Staats
Concord Plaza Office Park
3411 Silverside Road
Rodney Building, Suite 100H

1

Wilmington, DE    19810

Attonreys for Appellant

_____

*Judge Hutchinson participated in the panel argument and
conference, but died before this opinion was filed.

GARY A. MYERS, ESQ. (Argued)
Deputy Attorney General
Delaware Department of Justice
114 Market Street
Market Street Center, Suite 201
Georgetown, DE   19947

PAUL R. WALLACE, ESQ.
CARL C. DANBERG, ESQ.
Department of Justice
820 North Front Street
Wilmington, DE    19801

Attorneys for Appellees

_____

OPINION OF THE COURT
_____

ALITO, Circuit Judge:

William Henry Flamer, whose first-degree murder
conviction and death sentence were affirmed by the Delaware
Supreme Court, took this appeal from an order of the district
court denying his petition for a writ of habeas corpus.  When
Flamer's appeal was initially presented to this panel, he argued:
(1) that his confession was obtained in violation of the Fifth
and Sixth Amendments and therefore should have been suppressed;
(2) that his trial counsel was constitutionally ineffective; (3)

that the penalty-phase jury instructions violated the Eighth
Amendment because they improperly implied that the jury's
imposition of a death sentence would be reviewed by an appellate
court; (4) that the penalty-phase jury instructions violated the
Eighth Amendment because they referred to vague and duplicative
statutory aggravating circumstances; and (5) that the district
court record should have been expanded to include the criminal
record of Flamer's accomplice, Andre Deputy.  The fourth of these
arguments was similar to an argument that was raised in Bailey v.
Snyder, No. 93-9002, which was heard by another panel of our
court while Flamer's appeal was under consideration by this
panel.  Before a panel opinion was filed in either case, the full
court voted to rehear both cases for the purpose of addressing
the shared issue.  In this opinion, the panel that initially
heard Flamer's appeal discusses and rejects all of Flamer's
arguments other than the argument that was considered by the
court in banc.  The latter issue is addressed and rejected in a
separate opinion that is being filed simultaneously on behalf of
the in banc court.  Therefore, the order of the district court
denying Flamer's petition for a writ of habeas corpus will be
affirmed.

## I.

The bodies of Byard and Alberta Smith, an elderly
couple, were discovered by their 35-year old son, Arthur, on the
morning of February 7, 1979, in their home just outside
Harrington, Delaware.  Byard Smith had been stabbed 79 times,

3

primarily in the head and neck. His wife, Alberta, had been stabbed 66 times. Both victims had been stabbed with two knives. The Smiths were found on the floor of the living room, surrounded by blood and overturned chairs. Byard Smith's pockets had been turned out and emptied. In the kitchen, packages of frozen food lay strewn about the floor. The Smiths' car and television set were missing.

Upon discovering the bodies, the Smiths' son immediately called the police. Within hours, the police located the stolen car and identified William Henry Flamer, a nephew of Alberta Smith, as a possible suspect. The police went to Flamer's residence, which he shared with his grandmother and his father, and Flamer's grandmother invited the police to search the home. In Flamer's room, they discovered packages of frozen food similar to those found on the floor of the Smiths' kitchen. The Smiths' television set and fan were discovered in the kitchen closet, and a blood-encrusted bayonet was found on a stand in the kitchen.

The police presented their evidence to a Justice of the Peace and obtained a warrant to arrest Flamer for murder in the first degree. Acting on information that Flamer was in the Blue Moon Tavern on Route 13, the police discovered him walking near the tavern with two companions. Flamer had blood on his hands and clothing and fresh scratches on his neck and chest. The police arrested Flamer and brought his companions in for questioning. One of Flamer's companions, Ellsworth Coleman, was

4

released soon thereafter.  The other man, Andre Deputy,[0] was found to be carrying several items belonging to the Smiths, including two watches and a wallet containing Byard Smith's driver's license, automobile registration, and Social Security card.

Flamer and Deputy were questioned, at times together and at times separately, from 4:00 in the afternoon until 7:00 or 8:00 that evening at Troop 5 in Bridgeville.  The men gave conflicting accounts, each blaming the other for the murders. Miranda rights were read to Flamer several times during the interrogation, and each time, he waived his right to an attorney. Flamer claimed at a later suppression hearing that he repeatedly asked permission to call his mother so that she could contact Herman Brown, Sr., their family's lawyer, to represent him. However, this testimony was not credited by the Delaware courts, which found that Flamer did not request an attorney until his arraignment.  See Flamer v. State ("Flamer IV"), 585 A.2d 736, 747 (Del. 1990); Flamer v. State ("Flamer I"), 490 A.2d 104, 114 (Del. 1983 and 1984).

There was a snowstorm on the day of the arrest, and the Harrington Justice of the Peace had closed at 4 p.m.  Rather than drive Flamer to Dover, which was the nearest available site for an arraignment, the police placed him in a cell in Troop 5 overnight.  Without further interrogation, Flamer was brought

---

[0]See Deputy v. Taylor, 19 F.3d 1485 (3d Cir.), cert. denied, 114 S. Ct. 2730 (1994).

5

before the Harrington Justice of the Peace in the morning for his initial appearance.

At the arraignment, Flamer was informed of the charges against him and was again informed of his rights. Flamer asked the magistrate whether he could call his mother in order to ask about possible representation by Herman Brown, Sr. The magistrate told him he would be able to do so but also appointed the Public Defender to represent him in the interim. Flamer was then committed to Sussex County Correctional Institution without bail.

After the arraignment, Flamer called his mother, Mildred Smith, the half-sister of Alberta Smith. Flamer's mother told him that Herman Brown, Sr. had retired. Flamer arranged to meet his mother at Troop 5 before he was taken to the correctional facility, and she spoke with her son briefly at Troop 5 after the arraignment. Soon after Mildred Smith's departure, Corporal Porter, one of the officers who had questioned Flamer a day earlier, addressed him as follows:

> I asked him, I said, "Do you believe in God?" and he said, "Yeah." I said, "Then you got to believe in heaven and hell, right?" He said, "Yeah." I said, "Well, then you're going to burn in hell unless you get straight with me about what's happened today" or "what happened yesterday. I want you to tell me." I said, "You have to clear your conscience of what's going on" and this is when he started weakening up a little bit. He had some tears in his eyes and he said, "Okay, I'll talk to you." That's when I took him out of the cell.

Joint Appendix ("JA") at 1096. A short time later, Flamer confessed.

6

In his confession, which was given before he had consulted an attorney, Flamer gave the following account of the murders. After a day of drinking, he and Andre Deputy went to the Smiths' house just before midnight in order to rob them. Id. at 32. They brought with them a bayonet, a smaller knife, and a shotgun, and they hid the shotgun outside the Smiths' home. Flamer carried the smaller knife, and Deputy concealed the bayonet under his coat. In order to gain entry to the Smiths' home, Flamer told Alberta Smith that his grandmother had had a stroke and was missing. Id. at 32. Flamer and Deputy stood just inside the house speaking to the Smiths for about ten or fifteen minutes until Flamer, acting on a signal from Deputy, began to stab Byard Smith with the smaller knife, which he later threw away when he was stopped by the police on Route 13. Id. at 33–34. After Flamer began stabbing his uncle, Deputy began to stab Alberta Smith with the bayonet. At some point, Deputy also stabbed Byard Smith with the bayonet. After the couple died, the two men searched the bodies for money and found four wallets. Id. at 36. They fled in the Smiths' car, which they had loaded with property stolen from the house.

The two men drove to Flamer's home, where they stored some stolen items and burned three of the four wallets that they had taken from the Smiths. (The fourth was recovered from Deputy when the men were arrested.) Id. at 36. Flamer left his home alone in the Smiths' car. Outside Felton, Delaware, he became so drunk that he fell asleep. When he awoke, the car's battery was dead. Id. at 36–37. He abandoned the car, went to the Blue Moon

7

Tavern to meet Deputy and to shoot pool and drink, and he was arrested a few hours later.

Flamer was tried before a jury in 1980 on four charges of murder in the first degree,[0] possession of a deadly weapon during the commission of a felony, first-degree robbery, and misdemeanor theft.  Id. at 648.  Among the witnesses at the trial was the state medical examiner, who had performed autopsies on the bodies of Alberta and Byard Smith.  The medical examiner testified that both bodies had been stabbed with two different weapons, a bayonet and a smaller knife described as a kitchen paring knife.  Id. at 1070-72.  She testified that 19 of the wounds on Byard Smith were made by the bayonet, eight were from the paring knife, and 52 could have come from either weapon.  Regarding Alberta Smith's wounds, the medical examiner testified that 25 wounds were inflicted by the bayonet, two by the paring knife, and 39 could have come from either weapon.  Id.

The jury convicted Flamer on all charges, id. at 1416-17, and the trial then proceeded to the penalty phase.  Defense

---

[0]Del. Code Ann. tit. 11, § 636(a), provides in pertinent part as follows:

> A person is guilty of murder in the first degree when:
>
>> (1)  He intentionally causes the death of another person;
>>
>> (2)  In the course of and furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person.

Flamer was tried on both of these theories of first-degree murder for each of his two victims.

8

counsel called as witnesses the defendant, his mother, and his grandmother. Defense counsel introduced into evidence the reports of a psychologist and psychiatrist who had examined Flamer. Id. at 59-63, 65-67. Both reports concluded that Flamer seemed to be of low but normal intelligence, with no symptoms of psychosis or other mental illness, and would be competent to assist in his own defense and to stand trial. The psychiatrist's report diagnosed Flamer as an alcoholic, and stated that he had admitted being intoxicated at the time of the murders. After deliberating for about two hours and twenty minutes, the jury returned and imposed a penalty of death for each of the murder convictions.

In February 1983, the Delaware Supreme Court affirmed Flamer's convictions on direct appeal, but withheld decision on the death sentences pending the resolution of two death-penalty cases before the United States Supreme Court. Flamer I, 490 A.2d at 110-20. Following the denial of Flamer's certiorari petition to the United States Supreme Court, 464 U.S. 865 (1983), and more briefing in the Delaware Supreme Court, the Delaware Supreme Court affirmed Flamer's death sentences in September 1984. Flamer I, 490 A.2d at 120-58. Flamer again petitioned the United States Supreme Court for a writ of certiorari, but his petition was denied on October 7, 1985. 474 U.S. 865 (1985).

In June 1986, Flamer filed a motion for state post-conviction relief pursuant to Delaware Superior Court Criminal

Rule 35(a),[0] asserting various claims, including ineffective assistance of counsel and some issues that he had raised on direct appeal.  This motion was denied, and Flamer appealed the denial to the Delaware Supreme Court.  In February 1988, the Delaware Supreme Court issued an order consolidating Flamer's two post-conviction relief petitions and remanded to the Superior Court for a second post-conviction hearing pursuant to its newly promulgated Rule 61.[0]  State v. Flamer ("Flamer II"), No. 216,

---

[0]Rule 35, which was superseded in 1988 by Rule 61, permitted a court (a) to correct an illegal sentence at any time and (b) to correct a sentence imposed in an illegal manner upon motion within four months after sentence was imposed.  Del. Super. Ct. Crim. Rule 35.

[0]Rule 61 "governs the procedure on an application by a person in custody . . . under a sentence of this court to set aside a judgment of conviction on the ground that the court lacked jurisdiction to enter the judgment or on any other ground that is a sufficient factual and legal basis for a collateral attack upon a criminal conviction."  Del. Super. Ct. Crim. Rule 61(a)(1).  A motion for Rule 61 relief "shall specify all the grounds for relief which are available and of which the movant has, or, by the exercise of reasonable diligence, should have knowledge."  Del. Super. Ct. Crim. Rule 61(b)(2).  In addition to establishing routine procedures such as for the appointment of counsel and the timing and content of supporting briefs, Rule 61 permits the court to hold an evidentiary hearing or expand the record if necessary.  See Del. Supr. Ct. Crim. Rule 61(b)-(h).

Subsection (i) of Rule 61 establishes the procedural bars to relief.  Subsection (i)(1) limits the time in which to file a motion for postconviction relief to three years after the time the judgment of conviction becomes final or, "if it asserts a retroactively applicable right that is newly recognized after the judgment is final, [to no] more than three after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court."  Del. Super. Ct. Crim. Rule 61(i)(1).  Subsection (i)(2) bars repetitive motions "unless consideration of the claim is warranted in the interest of justice."  Del. Super. Ct. Crim. Rule 61(i)(2).  Subsection (i)(3) establishes "procedural default" for "[a]ny ground for relief that was not asserted in the proceedings leading to the judgment of conviction" unless there is "[c]ause for relief from

10

1987 (Del. Feb. 19, 1988). In April 1988, Flamer filed a new petition for post-conviction relief expanding upon his earlier claims. After supplemental briefing and an evidentiary hearing, the Superior Court denied Flamer's petition in June 1989. State v. Flamer ("Flamer III"), Nos. IK79-11-0236-R1, -0237-R1, -0238-R1, and -0239-R1. (Del. Super. Ct. June 16, 1989). This denial was affirmed by the Delaware Supreme Court in December 1990. Flamer IV, 585 A.2d at 745.

In addition to his state post-conviction relief petitions, Flamer filed a federal habeas petition in August 1987. In July 1989, this petition was stayed because Flamer had not yet exhausted his state post-conviction remedies. Once the Delaware Supreme Court affirmed the denial of Flamer's state petition, the federal stay was lifted. In October 1991, Flamer filed his third amended petition in the district court. In June 1993, the district court denied that petition. Flamer v. Chaffinch, 827 F. Supp. 1079 (D. Del. 1993). Flamer then took the appeal now before us.

## II.

---

the procedural default" and "[p]rejudice from violation of the movant's rights." Del. Super. Ct. Crim. Rule 61(i)(3). Likewise, subsection (i)(4) bars any claim previously adjudicated unless "warranted in the interest of justice." Del. Super. Ct. Crim. Rule 61(i)(4). Finally, subsection (i)(5) provides that the bars established in subsections (i)(1)-(3) do not apply to a claim the court lacked jurisdiction or to "a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction." Del. Super. Ct. Crim. Rule 61(i)(5).

11

Several of Flamer's arguments are based on the confession that he gave shortly after his arraignment. Flamer argues that this confession should have been suppressed under the Fifth and Sixth Amendments. Because the legality of the questioning that led to this confession is central to several of Flamer's claims, we will address this question first. Our analysis is divided into two parts. First, we will address whether the police violated Flamer's rights under the Sixth Amendment. Then we will consider whether they violated his Fifth Amendment rights.

### A. The Sixth Amendment Right to Counsel

As noted, Flamer asked for counsel at his arraignment. By subsequently questioning him and obtaining the confession at issue, Flamer contends, the police violated his Sixth Amendment right to counsel. Flamer advances two theories to support this argument. First, he argues that his confession should have been suppressed under Brewer v. Williams, 430 U.S. 387 (1977), because he did not voluntarily waive his right to an attorney after the arraignment. Second, he asserts that the Supreme Court's decision in Michigan v. Jackson, 475 U.S. 625 (1986), should be applied retroactively to his case and requires the suppression of his confession.

1. In Brewer, the defendant, a "deeply religious" escapee from a mental institution, 430 U.S. at 390, 392, was arrested on suspicion of murdering a young girl. The police transported him from Davenport to Des Moines, Iowa, where he was

12

supposed to meet with his attorney.  The police had agreed that they would not interrogate Williams en route, but while driving to Des Moines, a police officer, Detective Leaming, gave what has come to be known as the "Christian burial speech."[0]  See id. at 392.  Addressing Williams as "Reverend," the officer said that he felt that they should locate the girl's body so that her parents, whose child had been "snatched away from them on Christmas [E]ve," could give her a Christian burial.  430 U.S. at 392-93.  Williams eventually led the police to the girl's body.  Id. at 393.

---

[0]The Court recounted the speech as follows:

> "I want to give you something to think about while we're traveling down the road. . . . Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening.  They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it.  And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered.  And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all."

430 U.S. at 392-93.

The Supreme Court held that the Sixth Amendment required the suppression of the evidence elicited by the "Christian burial speech." Because judicial proceedings against Williams had begun, the Court noted, he had the right to the assistance of counsel. Id. at 398. In order to show that Williams had waived this right, the Court held, the state was required to prove "`an intentional relinquishment or abandonment of a known right or privilege.'" Id. at 404 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). The Court also stated that, in determining whether such a waiver had been made, it was necessary to "indulge in every reasonable presumption against waiver." Id. Viewing the question of waiver, not as "a question of historical fact, but one which . . . requires `application of constitutional principles to the facts as found,'" id. (citations omitted), the Court concluded that the state had not established that Williams had waived his right to counsel. The Court wrote:

> Despite Williams' express and implicit assertions of his right to counsel, Detective Leaming proceeded to elicit incriminating statements from Williams. Leaming did not preface this effort by telling Williams that he had a right to the presence of a lawyer, and made no effort at all to ascertain whether Williams wished to relinquish that right. The circumstances of record in this case thus provide no reasonable basis for finding that Williams waived his right to the assistance of counsel.
>
> The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams could not, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not.

14

Id. at 405-06 (emphasis in original).

In this case, the Delaware Supreme Court carefully applied the legal standard set out in Brewer and concluded that Flamer had made a valid waiver of his right to counsel. Flamer I, 490 A.2d at 112-16. The court explained:

> [W]e see the defendant as a twenty-five year old male who reached the eleventh grade of school, a convicted felon, and one who at the outset informed the police he knew his rights. There is no contention that he was not on numerous occasions given his constitutionally required rights as set forth in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). Nor is there any contention that defendant from the moment of arrest until contact was made with him through the Public Defender's office, ever attempted to invoke any of the Miranda rights. Instead, when confronted with the physical evidence seized by the police at his home, the blood on the coat he was wearing when he was arrested, the blood under his fingernails, and the articles belonging to the victim Byard Smith taken from one of his companions at the time of arrest, defendant volunteered fictitious stories of his complicity in the crimes while at the same time denying that he was guilty of killing anyone. He first told the police he was home asleep, that Andre Deputy aroused him, and that he went to the murder scene to help Deputy take the fruits of the murder to defendant's house. Defendant next told the police that he, Johnny Christopher and Andrew Deputy, had gone into the victims' home, and that it was Johnny who did the stabbing. In the entire record of this case there appears to be no time except initially when he claimed to be home asleep, that defendant denies his participation in the robberies and murders, although throughout, including the taking of his recorded statement, he steadfastly denies actually inflicting the fatal wound upon either victim. Neither is there any evidence in the record of this case that defendant was so religiously oriented

15

> that [Corporal Porter's] speech had the
> effect upon this defendant as [the "Christian
> Burial speech"] did upon the defendant in
> <u>Brewer v. Williams</u>, 430 U.S. 387, 97 S. Ct.
> 1232, 51 L.Ed.2d 424 (1977).

<u>Id.</u> at 114-15.

Reviewing the waiver question <u>de novo</u>, the district court reached the same conclusion, 827 F. Supp. at 1092-93, as do we.  While there are factual similarities between this case and <u>Brewer</u>, we are convinced, based on the totality of the circumstances, that Flamer understood his right to have an attorney present before speaking to Corporal Porter and that he validly waived that right.  As noted by the state supreme court, Flamer had an eleventh grade education and prior experience with the criminal justice system.  Before arraignment, he had been repeatedly advised of his right to have an attorney present during questioning, but he had repeatedly decided to speak with the police without an attorney, telling a succession of different stories in an obvious attempt to further his own interests. After the arraignment but before giving the taped confession, Flamer was again advised of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and he stated that he understood them.  <u>See</u> <u>Patterson v. Illinois</u>, 487 U.S. 285, 292-95 (1988).  Moreover, while Flamer's attorneys have referred to Corporal Porter's remarks as a modified Christian burial speech, we agree with the Delaware Supreme Court and the district court that there are significant differences between the tactics employed by the police in the two cases.  The police in <u>Brewer</u> appear to have

16

capitalized on Williams' unusual susceptibility to a religious appeal. Williams, as noted, was a "deeply religious" man with a history of mental illness, and he was addressed by the police as "Reverend." Here, by contrast, there is nothing in the record to indicate that Flamer was especially religious or that he suffered from any mental problems comparable to Williams'. Exercising plenary review, taking into account the totality of the circumstances, and applying the legal standard set out in Brewer, we conclude that Flamer knowingly and voluntarily waived his Sixth Amendment right to counsel before he confessed.

2. We thus turn to Flamer's argument that his post-arraignment confession must be suppressed under Michigan v. Jackson. In that case, the Supreme Court held that under the Sixth Amendment, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U.S. at 636. Before considering the merits of Flamer's argument, however, we must decide whether, as the state argues and the district court held, the application of Jackson to this case would violate the nonretroactivity principle of Teague v. Lane, 489 U.S. 288 (1989) (plurality), and subsequent Supreme Court decisions. See, e.g., Caspari v. Bohlen, 114 S. Ct. 948, 952-53 (1994); Graham v. Collins, 113 S. Ct. 892, 879-98 (1993); Butler v. McKellar, 494 U.S. 407, 412-14 (1990); Saffle v. Parks, 494 U.S. 484, 487-88 (1990); Penry v. Lynaugh, 492 U.S. 302 (1989).

17

The Supreme Court has explained Teague's

nonretroactivity principle as follows:

> The nonretroactivity principle prevents
> a federal court from granting habeas corpus
> relief to a state prisoner based on a rule
> announced after his conviction and sentence
> became final.  See, e.g., Stringer v. Black,
> 502 U.S. ___, ___, 112 S. Ct. 1130, 1139, 117
> L.Ed.2d 367 (1992). A threshold question in
> every habeas case, therefore, is whether the
> court is obligated to apply the Teague rule
> to the defendant's claim. . . .

> "[A] case announces a new rule if the
> result was not dictated by precedent existing
> at the time the defendant's conviction became
> final." Teague v. Lane, 489 U.S., at 301,
> 109 S. Ct., at 1070.  In determining whether
> a state prisoner is entitled to habeas
> relief, a federal court should apply Teague
> by proceeding in three steps.  First, the
> court must ascertain the date on which the
> defendant's conviction and sentence became
> final for Teague purposes.  Second, the court
> must "[s]urve[y] the legal landscape as it
> then existed," Graham v. Collins, supra, 506
> U.S. at ___, 113 S. Ct., at 898, and
> "determine whether a state court considering
> [the defendant's] claim at the time his
> conviction became final would have felt
> compelled by existing precedent to conclude
> that the rule [he] seeks was required by the
> Constitution." Saffle v. Parks, 494 U.S.
> 484, 488, 110 S. Ct. 1257, 1260, 108 L.Ed.2d
> 415 (1990).  Finally, even if the court
> determines that the defendant seeks the
> benefit of a new rule, the court must decide
> whether that rule falls within one of the two
> narrow exceptions to the nonretroactivity
> principle.  See Gilmore v. Taylor, 508 U.S.
> ___, ___ , 113 S. Ct. 2112, 2113, 124 L.Ed.2d
> 306 (1993).

Caspari, 114 S. Ct. at 953.

The first of these exceptions applies to decisions that

decriminalize "`certain kinds of primary, private individual

18

conduct beyond the power of the criminal-law making authority to proscribe.'" Teague, 489 U.S. at 311 (quoting Mackey v. United States, 401 U.S. 667, 692 (1971) (Harlan, J., concurring in the judgment). The second exception, which applies to "watershed rules of criminal procedure," id., is generally restricted to decisions announcing "new procedures without which the likelihood of an accurate conviction is seriously diminished." Id. at 313.

Proceeding in accordance with the three steps outlined in Caspari, we first note that Flamer's conviction and sentence became final for Teague purposes on October 7, 1985, when the Supreme Court denied his petition for a writ of certiorari to review the decision of the Delaware Supreme Court upholding his conviction and death sentence on direct appeal. See Caspari, 114 S. Ct. at 953 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state court has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."); Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987).

Advancing to the second step, we note that Jackson had not been decided on that date.[0] We must therefore survey the pre-Jackson legal landscape and determine whether a state court would have felt compelled by existing Sixth Amendment precedent to apply the Jackson rule even before it was embraced by the Supreme Court. Addressing this question in Collins v. Zant, 892

---

[0] Jackson was decided approximately six months later, on April 1, 1986. See 475 U.S. at 625.

19

F.2d 1502 (11th Cir.), cert. denied, 498 U.S. 881 (1990), the Eleventh Circuit held that "the rule announced in Jackson undoubtedly constitutes a `new rule'." Id. at 1511. The Eleventh Circuit explained that Jackson "imposed a new obligation on police (not to initiate an interrogation after a defendant has asserted his right to counsel under the [S]ixth [A]mendment) and established a bright-line rule excluding police-initiated statements (a result not dictated by then existing precedent)." Id. at 1512; accord Henderson v. Singletary, 968 F.2d 1070, 1073 (11th Cir.), cert. denied, 113 S. Ct. 621 (1992). See Bannister v. Armontrout, 4 F.3d 1434, 1440 n.7 (8th Cir. 1992) (petitioner could not rely on Jackson because it was decided after his conviction became final); see also McNeil v. Wisconsin, 501 U.S. 171, 179-80 (1991) (stating that Jackson established "a new Sixth Amendment rule of no police-initiated interrogation") (emphasis added).

Flamer argues that the decision in Jackson was "expressly foreshadowed" by Maine v. Moulton, 474 U.S. 159 (1985). It is clear, however, that Moulton does not support Flamer's position in this case. Like Jackson, Moulton was not decided[0] until after Flamer's conviction became final for retroactivity purposes. Moreover, Jackson was not "dictated" by Moulton. The holding in Moulton was quite narrow: that the Sixth Amendment right to counsel prohibits the police, after the initiation of judicial proceedings against a defendant, from

---

[0]Moulton was decided on December 10, 1985.

20

monitoring a conversation in which an undercover agent elicits statements from the defendant about the pending case.[0] This fact-specific holding did not compel the adoption of the sweeping Jackson rule, and nothing in the Jackson opinion suggests that the Supreme Court felt that it did. Indeed, the Jackson opinion did not rely heavily on Moulton and cited that case only for propositions that were quite peripheral to the Court's holding.[0]

Flamer next argues that the following court of appeals decisions dictated the Jackson rule: Felder v. McCotter, 765 F.2d 1245, 1250 (5th Cir. 1985), cert. denied, 475 U.S. 1111

---

[0] In Moulton, the police knew that a defendant under indictment was planning to meet with his codefendant, a secret government informant, for the purpose of discussing the pending charges and planning a defense. The police therefore arranged for the informant to wear a body recorder, and they recorded the conversation. Relying chiefly on Massiah v. United States, 377 U.S. 201 (1964), and United States v. Henry, 447 U.S. 264 (1980), the Court held that the state had violated Moulton's Sixth Amendment rights when it arranged to record his conversations with the undercover agent, Colson. "By concealing the fact that Colson was an agent of the State," the Court explained, "the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment." 474 U.S. at 177 (footnote omitted).

[0] Jackson cited Moulton four times. See 475 U.S. at 630 (citing Moulton, along with three other cases, for the proposition that, after the initiation of judicial proceedings, interrogation of the accused is a "critical stage" for Sixth Amendment purposes); id. at 632 (quoting Moulton's statement that the "Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a `medium' between him and the State."); id. (footnote omitted) (citing Moulton for the proposition that "the electronic surveillance of conversations with third parties . . . may violate the defendant's Sixth Amendment right to counsel even though the same methods of investigation might have been permissible before arraignment or indictment"); id. at 634 (citing Moulton in support of the proposition that "the Sixth Amendment concerns the confrontation between the State and the individual.").

21

(1986); United States v. Ledezma-Hernandez, 729 F.2d 310, 313 (5th Cir. 1984); United States v. Eagle Elk, 711 F.2d 80, 83 (8th Cir. 1983), cert. denied, 465 U.S. 1013 (1984). We see no merit in this argument. Jackson is not a new rule within the meaning of Teague unless it was "dictated by precedent existing at the time the defendant's conviction became final." Teague, 489 U.S. at 301 (emphasis in original). A rule is not dictated by precedent merely because there is a "debate among reasonable minds" as to its applicability. Butler, 494 U.S. at 415 (1990). At best, the cases cited by Flamer indicate a difference of opinion regarding the test for determining, under the Sixth Amendment, whether a defendant has waived the right to the presence of counsel during interrogation.[0]

Flamer's final argument in support of the conclusion that Jackson did not announce a "new rule" is that the Delaware Supreme Court's own decision in Deputy v. State, 500 A.2d 581, 591-92 (1985), cert. denied, 480 U.S. 940 (1987), compelled that court to adopt the Jackson rule. In Deputy, the Delaware Supreme

---

[0] Ledezma-Hernandez, 729 F.2d at 313, discussed the defendant's Fifth Amendment right to counsel pursuant to Edwards and Miranda. In Felder, 765 F.2d at 1248-50, the court applied a traditional Brewer analysis to circumstances in which a defendant is known to have counsel.

Although the Eighth Circuit in Eagle Elk, 711 F.2d at 82-83, did conclude that "the appropriate standard for reviewing the validity of a waiver of the [S]ixth [A]mendment right to have counsel present at an interrogation is essentially the same standard applied to waivers of the [F]ifth [A]mendment right to counsel where the right to counsel has been previously invoked," id. (footnote omitted), a single court of appeals decision cannot by itself "dictate" a rule subsequently articulated by the Supreme Court.

22

Court excluded the confession of Flamer's codefendant, Andre Deputy, which was obtained after Deputy's arraignment. Deputy, 500 A.2d at 592. In support of its conclusion excluding Deputy's confession, the Delaware Supreme Court wrote:

> In the Sixth Amendment context, once the adversarial judicial process has begun, [the] defendant is entitled to the presence of counsel during police interrogations as a matter of inherent right. Therefore, the only means by which waiver could be established, and still remain consistent with the Fifth Amendment waiver analysis, would involve some form of affirmative overt action by the defendant which indicated his willingness to talk to law enforcement officers.

Id. at 591. We see at least three major flaws in Flamer's argument that Deputy dictated the adoption of the Jackson rule.

First, it does not appear that the Delaware Supreme Court interprets its decision in Deputy as adopting a Jackson-like rule. In affirming the denial of Flamer's petition for postconviction relief, the Delaware Supreme Court decided, as a matter of state law, to adopt the Teague nonretroactivity rule for use in state postconviction proceedings. See 585 A.2d at 749. Under this rule, the Delaware Supreme Court's decision in Deputy was applicable to Flamer, since that decision was handed down before Flamer's conviction became final. Thus, if the Delaware Supreme Court had felt that its own decision in Deputy had adopted a rule like Jackson's, the Delaware Supreme Court should have applied that rule in Flamer's case. But Deputy was not even mentioned in this context. Instead, the Delaware

23

Supreme Court simply held that Jackson established a new rule and refused to apply that rule retroactively.

Second, we do not interpret Deputy as a foreshadowing of Jackson, but as an application of the totality-of-the-circumstances test set out in Brewer. The court in Deputy distinguished the factual circumstances of Deputy's confession from those of Flamer's confession, id. at 591-92 n.15, in a manner that suggested it was applying a traditional Brewer analysis. Unlike Flamer, who was brought before a magistrate on the morning after the day of his arrest, Deputy was interrogated at Troop 5 on the morning of his arrest and was given a polygraph before being arraigned at 2:00 P.M. Id. Although the magistrate ordered that Deputy be committed to the Sussex County Correctional Facility at this time, he was brought back to Troop 5 and questioned for another eight hours. Deputy did not respond when he was asked whether he wished to speak with an attorney. Considering the totality of the circumstances surrounding the two confessions, the Delaware Supreme Court held that Deputy's confession had to be suppressed under Brewer, id. at 592, although it had earlier held that suppresion of Flamer's confession was not required. See Flamer I, 490 A.2d at 113-115.[0]

Flamer contends that Jackson should nevertheless be applied retroactively because it fits within the second exception

_____

[0]Furthermore, we doubt that, as Flamer seems to argue, a rule can be old for Teague purposes in some states but new in others. Certainly, Flamer has not cited any precedent for this proposition. Accordingly, we hold, as has the Eleventh Circuit, that Jackson announced a "new rule."

24

to the Teague principle.  We disagree.  This exception is limited to "`watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Saffle, 494 U.S. at 495 (quoting Teague, 489 U.S. at 311).  As stated in Graham, this exception applies to that "small core of rules requiring `observance of those procedures that . . . are implicit in the concept of ordered liberty.'"  113 S. Ct. at 903 (quoting Teague, 489 U.S. at 311).  Like the Eleventh Circuit, we do not think that the Jackson rule fits into this category but is instead more accurately described as a prophylactic rule that provides one means of protecting a constitutional right.  See Collins, 892 F.2d at 1512.

We therefore hold that Jackson may not be applied retroactively in this case and that Flamer is not entitled to relief under the Sixth Amendment.


B.   The Fifth Amendment right to counsel

Flamer also argues that his confession must be suppressed under the Supreme Court's decision in Edwards v. Arizona, 451 U.S. 477 (1981), and other Fifth Amendment jurisprudence.[0]  In Edwards, the Court held that under the Fifth Amendment, once an accused has invoked the right to have counsel present during custodial interrogation, the accused cannot be questioned further until counsel has been made available unless

---

[0]The district court held that Flamer's Fifth Amendment claim was procedurally barred.  See 827 F. Supp. at 1087-89.  However, the state's appellate brief did not advance this argument, and we decline to address it.

the accused initiates the conversation and knowingly and intelligently waives his right to have counsel present. Id. at 484-85. Although Edwards was not decided until after Flamer's trial, Flamer's direct appeal was pending at the time of the decision, and therefore Edwards is applicable to his case. Flamer makes two separate arguments for the suppression of his confession under Edwards: (1) the Edwards rule came into play when he allegedly asked for an attorney during custodial interrogation prior to his arraignment and (2) the Edwards rule became applicable when he asked for counsel at the time of his arraignment.

1. In support of the first of these arguments, Flamer maintains that he requested an attorney during custodial interrogation by asking to call his mother. The Delaware courts found, however, that Flamer did not ask for an attorney during the interrogation. On direct appeal, the Delaware Supreme Court wrote that "defendant did not request counsel at any stage of his interrogation." Flamer I, 490 A.2d at 114. In denying Flamer's petition for post-conviction relief, the Delaware Superior Court found that "[a]t no time prior to or during the taped statement did Flamer tell any police officer that he wished to have an attorney present before any further questioning." Flamer III, JA at 2626-27. In affirming the decision of the Superior Court, the Delaware Supreme Court adhered to these findings. Flamer IV, 585 A.2d at 747.

Under the federal habeas statute, this court is bound by factual determinations made by a state court of competent

26

jurisdiction unless one of the exceptions set out in 28 U.S.C. §2254(d) applies. Flamer relies on the exception in 28 U.S.C. §2254(d)(8) that applies if a state court's factual determination is not "fairly supported by the record." Deference is owed to the factual findings of a state appellate court as well as to those of a trial court. Sumner v. Mata, 449 U.S. 539 (1981); Pemberthy v. Beyer, 19 F.3d 857, 864 (3d Cir. 1994); Hakeem v. Beyer, 990 F.2d 750, 768 (3d Cir. 1993). Thus, the factual findings of the Delaware courts are binding on this court if they have fair support in the record. We conclude that they do.

Flamer testified at his suppression hearing, held before the Delaware Superior Court in a post-conviction proceeding, that on several occasions prior to his confession, he had asked permission to make a phone call. JA at 1861, 1862, 1864, 1865, 1867. However, Flamer's testimony that he asked for a lawyer during his interrogation was contradicted at the suppression hearing by several officers. See, e.g., Transcript of Suppression Hearing (Oct. 29, 1979), Testimony of Officer Chaffinch, JA at 120 ("Q: Did he [Flamer] ever ask for a lawyer? A: No. In fact, I asked him did he want to call one on a couple of occasions and he said no, indicating no."). In addition, Flamer acknowledged at the Rule 61 evidentiary hearing that he thought his Miranda rights had been read to him shortly after his arrest. JA at 2547. See also Transcript of Suppression Hearing (Oct. 31, 1979), Testimony of Officer Callaway, JA at 342 (stating that Flamer's rights had been read to him when he was arrested and again when he was first brought to Troop 5, and that

27

on neither of these occasions did Flamer request an attorney). In light of this evidence, the state courts' findings that Flamer did not request an attorney are fairly supported by the record and are thus binding.[0]

2. Flamer also argues that he invoked his Fifth Amendment right to counsel at the arraignment, which occurred before his confession. At the arraignment, Flamer asked permission to call his mother "in order to inquire about bail and possible representation by counsel." Flamer IV, 585 A.2d at 742. The magistrate told him he was free to do so "but that he would appoint the public defender to represent him in any event." Id. Flamer and the magistrate both signed a form labeled "Application and Order Appointing Counsel." See JA at 30. The portion signed by Flamer stated that he "request[ed] appointment of counsel"; the portion signed by the magistrate stated that, "not having waived the appointment of counsel," the defendant would be represented by the public defender. Id.

Turning first to Flamer's request to call his mother "to inquire about . . . possible representation," 585 A.2d at 742, we hold that this request was insufficient to trigger Edwards under the Supreme Court's decision in Davis v. United

---

[0]Flamer asserts that these state court findings are flawed because no Edwards Fifth Amendment claim was under consideration during the proceedings in which the factual determinations were made. Whether Flamer requested an attorney is a question of fact, however, and the validity of the state courts' findings is not affected because the courts were considering a somewhat different legal issue when those findings were made.

28

States, 114 S. Ct. 2350 (1994). In that case, the Court held that Edwards applies only if a defendant "unambiguously" requests counsel. Id. at 4589. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," Edwards does not come into play. Id. Here, Flamer's request to telephone about possible representation "fail[ed] to meet the requisite level of clarity" that Davis demands. Id.

As for Flamer's contention that Edwards was triggered by his request for the appointment of counsel at the arraignment, this argument is foreclosed by McNeil v. Wisconsin, 501 U.S. 171 (1991). There, the defendant requested an attorney at his arraignment for an armed robbery in West Allis, Wisconsin, but during subsequent custodial interrogation regarding offenses that

---

Davis may be applied retroactively despite Teague v. Lane because Teague only applies to a change in the law that favors criminal defendants. Gilmore v. Taylor, 113 S.Ct. 2112, 2116 (1993). See also Lockhart v. Fretwell, 113 S.Ct. 838, 844 (1993).

Like Davis, McNeil may be applied retroactively because McNeil did not work a change in the law favoring criminal defendants. See supra note 14.

The Supreme Court was reviewing a decision of the Wisconsin Supreme Court that answered "no" to the following question certified by the intermediate state appellate court:

> Does an accused's request for counsel at an initial appearance on charged offense constitute an invocation of his fifth amendment right to counsel that precludes police initiated interrogation on unrelated, uncharged offenses.

See 501 U.S. at 175.

29

occurred in Caledonia, Wisconsin, he waived his Miranda rights without the presence of counsel and gave incriminating statements about the Caledonia offenses. The Supreme Court held that suppression of these statements was not required under either the Sixth or Fifth Amendments. The Court concluded that the Sixth Amendment and the rule adopted in Michigan v. Jackson, supra, did not apply because they are "offense specific." Id. at 175. Thus, the Court held, invocation of the Sixth Amendment right to counsel does not restrict police-initiated interrogation concerning other offenses. Id. at 175-78. As for the Fifth Amendment right to counsel recognized in Miranda and Edwards, the Court held that the defendant had never invoked that right. The Court held that the defendant's request for counsel at arraignment was inadequate to invoke Edwards. Rather, the Court concluded, Edwards "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. Requesting the assistance of an attorney at a bail hearing does not bear that construction." Id. at 178 (emphasis in original).

Under McNeil, Flamer's request for counsel at arraignment did not constitute an invocation of his Fifth Amendment right to counsel during custodial interrogation. Pursuant to this precedent, Flamer's request cannot "reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." 501 U.S. at 178 (emphasis in original).

30

In response to the state's reliance on <u>McNeil</u>, Flamer's reply brief first argues as follows:

> <u>McNeil</u> stands only for the proposition that an accused's Sixth Amendment right to counsel does not preclude police initiated interrogations related to offenses distinct from those with which he or she is charged. This holding has absolutely no applicability in Flamer's case.

Reply Br. at 11. This brief later states:

> <u>McNeil</u> simply stands for the proposition that an accused who has requested and been appointed an attorney at a bail hearing on specified charges has not invoked his right to have counsel present when questioned regarding other charges.

<u>Id.</u> at 25.

We disagree with this interpretation of <u>McNeil</u>, which must be based on one or both of the following propositions: (a) that <u>McNeil</u> addressed only the accused's Sixth Amendment right to counsel or (b) that the Fifth Amendment right to counsel is offense specific. Both of these propositions, however, are incorrect. As noted, <u>McNeil</u> addressed both the accused's Fifth and Sixth Amendment rights. Moreover, it is well established that the Fifth Amendment right to counsel during custodial interrogation (and the <u>Edwards</u> rule, which is based on this right) are <u>not</u> offense specific. As the Supreme Court clearly stated in <u>McNeil</u>, 501 U.S. at 177 (emphasis in original):

> The <u>Edwards</u> rule. . . is <u>not</u> offense specific: Once a suspect invokes the <u>Miranda</u> right to counsel for interrogation regarding one offense, he may not be reapproached regarding <u>any</u> offense unless counsel is present. <u>Arizona v. Roberson</u>, 486 U.S. 675 (1988).

31

See also Alston v. Redman, 34 F.3d 1237, 1243 (3d Cir. 1994) ("The Edwards protection is not offense-specific. Rather, a suspect who has requested the presence of counsel cannot be questioned concerning any crime, not just the one that put him in custody."), cert. denied, 115 S. Ct. 1122 (1995).

Once it is recognized that the Fifth Amendment right to counsel and the Edwards rule are not offense-specific, it becomes clear that McNeil stands for the proposition that a request for an attorney at arraignment is, in itself, insufficient to invoke the Fifth Amendment right to counsel at subsequent custodial interrogation -- even if that interrogation concerns the offense on which the defendant was arraigned. In McNeil, as noted, the defendant requested counsel at his arraignment on the West Allis charge. If this request had constituted the invocation of the Miranda right to counsel with respect to future custodial interrogation concerning the West Allis offense, this request would have likewise restricted future custodial interrogation concerning any other offenses, including the Caledonia offense, because "[o]nce a suspect invokes the Miranda right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present." McNeil, 501 U.S. at 177 (emphasis in original). The Supreme Court held, however, that the Edwards rule did not apply to McNeil's subsequent custodial interrogation concerning the Caledonia offenses. In light of the fact that the Edwards rule is not offense-specific, this holding cannot rest on the

32

distinction between the West Allis and Caledonia offenses.
Rather, it must rest on the proposition that merely requesting an
attorney at arraignment is insufficient to constitute a request
for an attorney in connection with future custodial

interrogation.  As the Court stated, the Edwards rule applies

> only when the suspect "ha[s] expressed" his
> wish for the particular sort of lawyerly
> assistance that is the subject of Miranda.
> Edwards, supra, at 484 (emphasis added).  It
> requires, at a minimum, some statement that
> can reasonably be construed to be an
> expression of a desire for the assistance of
> an attorney in dealing with custodial
> interrogation by the police.  Requesting the
> assistance of an attorney at a bail hearing
> does not bear that construction.

McNeil, 501 U.S. at 178 (emphasis in original omitted; emphasis
added); see also, Alston, 34 F.3d at 1244-48 (Fifth Amendment
right to counsel at custodial interrogation cannot be invoked
anticipatorily). Consequently, we hold that Flamer's request for
counsel at arraignment did not trigger Edwards.

In addition, even if Flamer's argument were not
directly controlled by McNeil, we do not believe that his
argument could survive Teague's nonretroactivity principle.  In
answer to the respondent's reliance on Teague in the district
court, Flamer's opening brief states that many of his arguments
concerning this question "parallel [his] Jackson `new rule'
argument," and he cross-references the portion of his brief that
contends that Jackson was not a "new rule."  See Appellant's Br.
at 57.  We have already concluded, however, that Jackson was a
"new rule," and consequently this conclusion seriously undermines

33

Flamer's contention that his invocation of his right to counsel at arraignment prohibited any subsequent police-initiated questioning about <u>any offense</u> without counsel present. Prior to <u>Jackson</u>, no such rule was dictated by existing precedent. Indeed, we are not aware of any precedent that dictates the adoption of such a rule even today. Adoption of such a rule would extend both <u>Jackson</u> (by making it non-offense-specific) and <u>Edwards</u> (by making the invocation of the right to counsel at arraignment sufficient to trigger an accused's Fifth Amendment rights). Such an extension, like <u>Jackson</u>, <u>see</u> <u>supra</u> pages 16 to 24, and <u>Edwards</u>, <u>see</u> <u>Solem v. Stumes</u>, 465 U.S. 638 (1983), would constitute a "new rule" that could not be applied retroactively to Flamer's case.[0]

## III.

Flamer contends that he is entitled to a new trial because he was given constitutionally ineffective assistance by

---

[0]Although respondent expressly relied on <u>Teague</u> in the district court, their brief on appeal does not contain any such express reliance. Nevertheless, we believe it is appropriate for us to apply <u>Teague</u>. "[A] federal court may, but need not, decline to apply <u>Teague</u> if the State does not argue it." <u>Caspari</u>, 114 S. Ct. at 953; <u>Schiro v. Farley</u>, 114 S. Ct. 783, 788 (1994). Here, the respondents expressly argued <u>Teague</u> in the district court in relation to this argument, and they vigorously argued <u>Teague</u> on appeal in relation to Flamer's <u>Jackson</u> argument, which Flamer acknowledges is closely related and is governed by essentially the same <u>Teague</u> analysis. This case is thus quite different from <u>Wilmer v. Johnson</u>, 30 F.3d 451, 454-55 (3d Cir. 1994), in which we declined, in the exercise of our discretion, to apply <u>Teague</u>. In that case, the defense had not been raised in the district court and was first raised "in a supplemental brief requested by the court on appeal." <u>Id.</u> at 7.

34

the attorney who represented him in his original trial and direct appeal, Dennis Reardon.  Flamer rests his argument on the following alleged errors of his attorney: (1) failure to seek suppression of the confession on Fifth and Sixth Amendment grounds; (2) failure to present a "unified" defense theory; (3) inadequate cross-examination of the medical examiner; (4) calling Flamer to testify; (5) failure to make a closing argument in the guilt phase of the trial; and (6) inadequate presentation of mitigating evidence and a cursory closing in the penalty phase of the trial.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-part test for judging ineffective assistance of counsel claims.  First, the defendant must show that counsel's performance was deficient.  This requires showing that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687.  After explaining that this showing requires proof that "counsel's representation fell below an objective standard of reasonableness.... under prevailing professional norms," id. at 688, the Court admonished:

> Judicial scrutiny of counsel's performance must be highly deferential..., [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

Id. at 689.

Second, the defendant must show that counsel's ineffectiveness was prejudicial.  Id. at 692.  In Strickland, the Court wrote that "when a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  The Court added that "when a defendant challenges a death sentence. . . , the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Id.  More recently, in Lockhart v. Fretwell, 113 S. Ct. 838, 842 (1993), the Court clarified the meaning of "prejudice" under the Strickland test, explaining:

> Under our decisions, a criminal defendant alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." . . .  Thus, an analysis focussing solely on the mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective.

Id. (citation and footnote omitted).  Applying these standards, we will address each of the errors alleged by Flamer.

### A.    Admission of Flamer's confession

Flamer alleges that his attorney rendered constitutionally deficient assistance because he failed to investigate the circumstances of Flamer's confession and failed to move to suppress the confession before trial.  As we discussed

36

above, however, admission of the confession did not violate Flamer's rights under the Fifth or Sixth Amendment and, in light of this conclusion, Flamer's ineffective assistance of counsel argument must fail.

First, it seems clear that Flamer's trial attorney did not render constitutionally deficient assistance by failing to seek relief -- suppression of the confession -- that was not warranted under the law as it existed before Flamer's conviction became final. Second, Flamer was not prejudiced by counsel's performance because he would not have been entitled to suppression of the confession even if that relief had been sought. The possibility that the trial judge might have erroneously ruled in Flamer's favor had a motion to suppress been made -- and there is nothing to suggest that the judge would have made such an error -- does not establish prejudice under Strickland. "A defendant has no entitlement to the luck of a lawless decisionmaker." Strickland, 466 U.S. at 695. As the Court squarely held in Fretwell, 113 S. Ct. at 842-45, a finding of prejudice under Strickland cannot be predicated on the possibility that the defendant might have benefitted from an erroneous decision in his or her favor.

B.   Failure to pursue a "unified" theory of defense

Flamer claims that Reardon was constitutionally ineffective because he failed to develop or pursue a theory of the case that was uniform throughout the guilt and penalty phases

37

of the trial. In response to this argument, the Supreme Court of Delaware wrote:

> We adopt the finding of the Superior Court which concluded that Flamer's claim is contradicted by the evidence. Reardon's strategy was to raise doubt in the State's case against Flamer by asserting that Deputy, rather than Flamer, was responsible for the homicides. . . . Reardon's performance was within the wide range of reasonable professional assistance.

585 A.2d at 755-56. The district court agreed, stating:

> On the record presented, the Court concludes that a unified defense was presented and while trial counsel may not have been the best advocate, his performance was within the standards required by Strickland. Further, as found by the state court, the evidence against Flamer even absent his confession was so overwhelming as to prohibit any conclusion of prejudice on collateral review.

827 F. Supp. at 1104.

Whether Reardon formulated a "unified" theory is a question of fact, and we are therefore bound by the findings of the state courts, unless one of the exceptions set out in 28 U.S.C. § 2254(d) is met. Flamer seems to suggest that the exception in 28 U.S.C. § 2254(d)(8) applies, because the state courts' findings are not fairly supported by the record, but we find it unnecessary to reach this question.[0] Even if Reardon

---

[0] There is clearly some support in the record for the state courts' findings that Reardon's strategy throughout the case involved the casting of blame on Deputy. At the post-conviction hearing, Reardon testified that his strategy in the guilt phase was "[t]hat William [Flamer] didn't do it. That any participation William had was at the instigation of Andre Deputy. I think William's statement indicated that he did do some stabbing but he didn't cause any death." J.A. 2350. Consistent

38

never formulated a "unified" theory, that in itself would not constitute ineffective assistance of counsel.

It seems quite obvious that a defense attorney's performance need not be based on some grand overarching theory in order to meet constitutional requirements. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland v. Washington, 466 U.S. at 689. Perhaps the single most commonly employed defense trial strategy is to eschew any single pre-planned theory and to put the prosecution to its proof and exploit any weakness that became evident as the trial unfolds.[0]

Thus, even if Reardon did not have a single "unified" theory, it does not necessarily follow that his performance was deficient. Whatever other strategy or strategies Reardon might

---

with this approach, at the penalty phase, Reardon referred to Deputy's role, albeit briefly, in his opening and closing.

It is true that when Reardon was asked at the post-conviction hearing what his theory was at the penalty phase, he replied laconically that his theory was to present Flamer as "a poor uneducated drunk." JA at 2350. We are not persuaded, however, that this statement alone is sufficient to undermine the findings of the Delaware courts that Reardon's strategy at both phases of the trial involved the casting of blame on Deputy.

[0]During the Rule 35 hearing, Reardon stated that he had discussed with Flamer prior to trial what they would be doing: "Basically what a criminal trial is all about; how it will proceed and what we shall do; what we shall attempt to do and that is to discredit during cross-examination." JA at 1897. Later, he described his strategy: "Our game plan as we expected one to be was certainly to pay as close attention as possible in trying to grasp ahold of any weakness the State might produce or leave out; mainly to try to demonstrate that William was, as he said, not the instigator, that Williams [sic] just happened to be along and got caught up into something that was out of his control." Id. at 1899.

39

have also had in mind, the record is plainly sufficient to show that he attempted during the guilt phase to exploit weaknesses in the state's case and to cast blame on Deputy and that he sought during the penalty phase to elicit pity for Flamer. In view of the evidence with which Reardon had to contend, such an approach hardly seems unreasonable.

At all events, we believe that it is Reardon's actual performance at trial, rather than his pretrial strategizing, that is most pertinent. As the Supreme Court has stated, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the burden of guilt." United States v. Cronic, 466 U.S. 648, 659 (1984) (emphasis added).

In this connection, Flamer complains that Reardon did not do enough to shift blame to Deputy. We will discuss the penalty phase below, but with respect to the guilt phase we see no merit in this argument. Flamer refers to Deputy's prior criminal convictions, but he does not explain how Reardon could have secured the admission of these convictions at the guilt phase. See Del. Uniform Rule of Evid. 404(b). He also suggests that Reardon should have emphasized the following facts:

> Deputy was from the city. Flamer was the
> product of a small town. Deputy was older
> and larger and more violent than Flamer.
> Deputy had the victims' belongings on his
> person when arrested.

Appellant's Br. at 30. In view of all of the evidence in this case, these facts strike us as having only a modest potential for

benefiting Flamer.  We are not prepared to hold that Reardon violated the Sixth Amendment by failing to exploit them.

Furthermore, even if evidence regarding Deputy could have been presented more effectively, we do not believe that Flamer was prejudiced by the failure to do so.  Flamer was confronted by overwhelming physical evidence connecting him to the crime.  In his confession, he admitted that it was he, not Deputy, who initiated the stabbing.  In addition, Flamer was the Smiths' nephew, and it was that relationship that enabled Flamer to talk his way into their home in order to murder them. Although Deputy, unlike Flamer, had a violent criminal record at the time of the slayings, we do not believe there is a "reasonable probability" under Strickland, 466 U.S. at 695, that the jury, had it been presented with more evidence about Deputy or his record, would have concluded that Flamer had not committed these murders.


C.    Cross-examination of the medical examiner

Flamer asserts that Reardon did not cross-examine the medical examiner adequately in that he "failed to inquire whether the wounds on the victims could have been inflicted by a third weapon even though Flamer had mentioned . . . a third weapon in the taped statement."  Flamer's Br. at 32-33.  Flamer argues that by eliciting testimony regarding a possible third weapon, Reardon could have created reasonable doubt regarding Flamer's guilt on the intentional first-degree murder count.

41

This claim is highly speculative. First, although Flamer did confess to the police that he had disposed of another knife in addition to the one with which he admitted stabbing his uncle, JA at 33-34, Flamer did not say that this knife was present during the murder; nor did he ever suggest that Deputy had used it or even knew of its existence. In order to create a reasonable doubt using a "third-knife" theory, Reardon would have needed to establish some probability that each of the following things occurred: (1) a third knife such as the one described by Flamer in his confession could have produced some of the wounds found on the bodies of the two victims; (2) this third knife was brought to the Smiths' home; (3) Deputy elected to discard his bayonet in favor of a smaller knife in the midst of stabbing the two victims; and (4) Flamer did not use this knife. Even if Reardon succeeded in making all this seem possible, however, he still would have needed to contend with the fact that Flamer's confession does not mention any of this in discussing the murder.[0]

---

[0]
Q: You used your little knife to stab Byard? Who had the big knife?

A: Andre.

Q: And he used it to stab who?

A: He killed Aunt Alberta and then he was killing Byard.

Q: With the big knife?

A: Unhu.

Q: Did you ever have the big knife?

We believe that the strategy now proposed by Flamer was extraordinarily unlikely to succeed.  Therefore, we cannot say that it was constitutional error for Reardon not to pursue it.

### D.   Calling Flamer to testify

Flamer also assigns error to Reardon's decision to call him as a witness in his own defense.  Flamer's testimony at trial contradicted his prior statements, which made him appear not credible, he now says.  At trial, Flamer testified that Andre Deputy woke him up on the night of the murder and brought him to the Smiths' house to help steal frozen food.  JA at 1275-1276.  Flamer testified that when he asked Deputy where the Smiths were, Deputy told him, "Never mind about that."  Id. at 1276.  Soon after, Flamer testified, he saw the dead bodies in the living room.  Id. at 1277-78, 1280.  Flamer's story was badly damaged on cross-examination.

At the Rule 35 hearing held in September 1986, Reardon testified that he felt it was important for Flamer to testify. As he explained:

> Through the years of criminal law, defense of
> criminals, I have had occasions on many times
> to talk to different judges of the Superior
> Court and in this case -- if my memory serves
> me correctly, present Chief Justice Christie

A:   Did I ever have it?

Q:   The whole time you was in the house during the stabbing you used the small knife and he used the big knife.

A:   I used the small one.

JA at 43.

> in a case many, many years ago in chambers,
> and I believe it was in Wilmington, told me
> that he has really never presided over, or
> maybe one or two cases he has presided over,
> where a jury found a defendant not guilty who
> did not testify and I put that in my memory
> bank and I have used it ever since knowing
> full well that if a person doesn't testify
> they are very likely to be found guilty.
> William and I discussed it and decided that
> he should testify and he did testify.

Id. at 1903-04. Reardon's belief that a defendant is unlikely to be acquitted unless he takes the stand is one that is widely shared by practitioners. Thus, as a general matter, we do not think it is unreasonable for a defense attorney to proceed on the basis of this belief, particularly in a case such as this where the prosecution's evidence is very strong.

If Flamer was harmed by his testimony, this was probably owing to the fact that he perjured himself. Flamer, however, has never suggested that it was Reardon's idea for him to testify as he did, and Reardon cannot be faulted for Flamer's decision to testify falsely. Indeed, the Delaware Supreme Court seems to have concluded that Flamer's testimony departed from the version of the events that he had previously told Reardon. See Flamer IV, 585 A.2d at 755 ("Once Flamer had testified to a different set of events than he had previously divulged to his attorney, it was too late to alter the decision to testify."). Moreover, given the overwhelming evidence of Flamer's guilt, we are convinced -- as were the state supreme court, 585 A.2d at 755, and the district court, 827 F. Supp. at 1104 -- that there is no reasonable probability that his testimony altered the verdict that the jury would have otherwise returned.

44

E.    Waiver of closing argument

Flamer also argues that his attorney violated the Sixth Amendment by failing to give a closing argument in the guilt phase of the trial.  In the Rule 35 post-conviction hearing, Reardon testified that this had been a conscious strategy on his part to avoid a devastating rebuttal from the prosecution.  Id. 1906-09.  Specifically, Reardon stated that in "dozens" of cases, he had seen Flamer's two prosecutors give a simple and relatively brief closing statement followed by a lengthy rebuttal after the defense had closed.  Id. at 1909.  Reardon also stated that after the trial, one of the prosecutors "said he was prepared for two to three hours of rebuttal."  Id. at 1907.

The Delaware Superior Court accepted Reardon's explanation, Id. at 426, and the state Supreme Court found that there was adequate record support for this finding.  Flamer IV, 585 A.2d at 754.  The state supreme court wrote:

> The Superior Court found that Kent County prosecutors at the time of Flamer's trial were said to be routinely holding back their major arguments in summation until after the defense had given its closing argument to the jury.  The Superior Court further found that Reardon's choice to omit a closing argument was made after Reardon assessed the prosecution's opening argument as having little impact on the jury. When this assessment and the waiver of closing argument are viewed in light of the "sandbagging" practice said to be utilized during rebuttal by Kent County prosecutors, such a waiver was within the wide range of reasonable professional assistance.

45

Id. at 754-55.

Flamer argues that the state court's finding is not fairly supported by the record and that Reardon's testimony at the post-conviction hearing was concocted to justify "what would otherwise appear an utterly inexplicable act." Appellant's Br. at 40. We reject this argument. For one thing, we believe that the state court was entitled to credit the testimony that Reardon gave at the post-conviction hearing. Moreover, despite Flamer's attack on Reardon's credibility, the prosecutorial tactic to which Reardon referred is substantiated by Bailey v. State, 440 A.2d 997 (Del. 1982). In that case, which was prosecuted by one of the prosecutors who tried Flamer, the state's "opening summation was very brief, constituting a mere 3 1/2 pages of the transcript and lasting only 5 minutes." Id. at 1000. "The State's rebuttal lasted over an hour and contained the bulk of the State's final argument to the jury." Id. at 1001. For these reasons, we too conclude that there was adequate support in the record for the findings of the state courts, and therefore we accept their conclusion that Reardon's failure to give a closing argument was a conscious strategic decision.

Whether Reardon's decision was reasonable, however, is a question of law that we must decide separately. Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991), cert. denied, 503 U.S. 592 (1992). Our court and others have recognized that waiver of summation may be a sound tactic in some circumstances. United States ex rel. Spears v. Johnson, 463 F.2d 1024, 1026 (3d Cir. 1972); Virella v. United States, 750 F. Supp. 111, 118

46

(S.D.N.Y. 1990); <u>United States ex rel. Turner v. Cuyler</u>, 443 F. Supp. 263 (E.D. Pa. 1977), <u>aff'd</u>, 595 F.2d 1215 (3d Cir. 1979); <u>Melvin v. Laird</u>, 365 F. Supp 511, 521 (E.D.N.Y. 1973) ("Had defense counsel sought to sum up, undoubtedly the prosecution would have countered his arguments.  Such an exchange of arguments, assuming neither counsel was much superior to the other, could only, by dwelling on the details of the evidence, have hurt the [habeas petitioner].").  Although Reardon's decision to forgo a closing statement may not have been wise, we cannot say, in light of his explanation, that the decision fell below <u>Strickland</u>'s objective standard of reasonableness.

Furthermore, Flamer has not shown that he suffered any actual prejudice, for there is no reasonable probability that he would not have been convicted even if Reardon had presented a dazzling closing argument.

### F.   Alleged errors in penalty phase

Flamer asserts that Reardon made two serious errors in the penalty phase of the trial:  (1) he failed to investigate, develop, present, and argue mitigating evidence and (2) his closing argument was deficient.  The standards for determining whether counsel has been ineffective in a capital sentencing proceeding are identical to the standards for the guilt phase of the trial.  <u>Strickland</u>, 466 U.S. at 686-87.  Accordingly, the defendant must show that counsel's representation fell below an "objective standard of reasonableness . . . under prevailing professional norms," <u>id.</u> at 688, and that there is "a reasonable

probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," id. at 695. We do not believe that Reardon provided ineffective assistance during the penalty phase under the Strickland standard.

In his opening statement, Reardon began by informing the jurors that if they chose not to impose the death penalty, Flamer would remain in prison for life without the possibility of parole or probation. JA at 1480. Reardon then asked the jurors to examine carefully the reports of the psychiatrist and psychologist, noting that these two experts were employed by the state and not the defense. Id. at 1481. Reardon foreshadowed the testimony of his three witnesses by stating that Flamer had been "a good son" and "a good grandson," whose life had been destroyed by alcoholism. Finally, Reardon argued that Flamer's "dull normal" intelligence had rendered him particularly susceptible to the influence of "a strong personality" such as that of Andre Deputy. Id. at 1482.

Reardon introduced the written reports of a psychiatrist and a psychologist into evidence. Id. at 59-63, 65-67. Both reports concluded that Flamer was of low but normal intelligence, without symptoms of psychosis or other mental illness. The psychiatrist diagnosed Flamer as an alcoholic and stated that he had admitted being intoxicated at the time of the murders.

Reardon called three penalty-phase witnesses. Id. at 1432-1457. Flamer himself described his life, with particular

48

attention paid to his drinking problem.  He told the jury about his brief marriage, which had ended in divorce, and his three-year old daughter.  He stated that he had had trouble finding steady employment, but that he would do odd jobs and part-time work whenever he had an opportunity to do so.  He also described the day of the murder, a day that he had spent drinking heavily with friends.  Next, Flamer's mother, Mildred Smith, testified.  Although Flamer had lived with his grandmother rather than his mother since he was five, Mrs. Smith testified that she saw her son nearly every day after work.  She stated that he had been a good student until he quit school in the eleventh grade and began drinking heavily.  She also said that his personality could sometimes change when he was drinking.  Mrs. Smith discussed the failure of her son's marriage and the difficulty he had had finding steady work as a result of his criminal record.[0]  Finally, Reardon called Flamer's grandmother, Florence Benson, to testify.  Mrs. Benson stated that Flamer had always been "a good boy," who had taken care of her by doing household chores.  Id. 1456.

The state presented no testimony and only one piece of evidence during the penalty phase -- a certified record of Flamer's two felony convictions for check forgery.

1.  Flamer argues that Reardon made three significant errors in the development and presentation of penalty-phase evidence:  (1) he did not seek out Flamer's school and medical records;  (2) he did not call as a witness a psychiatrist or

---

[0]In 1975, Flamer was convicted of two counts of forgery.

49

psychologist to explain the reports entered into evidence;  and (3) he did not introduce evidence of Andre Deputy's history of violence in order to show that Deputy, rather than Flamer, was chiefly to blame for the murders.

With respect to Reardon's failure to seek out Flamer's school and medical records, we note that Flamer has not proffered any such evidence that he thinks would have helped to reduce his penalty.  Therefore, Flamer cannot claim to have been prejudiced by Reardon's failure to introduce such evidence.  See Zettlemoyer v. Fulcomer, 923 F.2d 284, 300-02 (3d Cir.), cert. denied, 502 U.S. 902 (1991).  Similarly, we do not see how calling a witness to explain the medical reports would have created a reasonable probability that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," Strickland, 466 U.S. at 695.  The reports themselves are plainly worded, and we do not think the jury required additional oral testimony to explain them.

Flamer asserts that Reardon should have offered evidence regarding Andre Deputy's record of violence.  As we discussed in Section III.B, Flamer was not prejudiced by Reardon's failure to present evidence of Deputy's criminal record in the guilt phase of the trial.  Here, Flamer maintains that if the jurors had known more about Deputy, there is a reasonable probability that they would have concluded that Flamer, as the less aggressive of the two murderers, did not deserve to die.  We disagree.  As discussed earlier, it was Flamer, according to his own confession, who first stabbed Mr. Smith.  In addition, it was

50

Flamer, as the Smiths' nephew, who was able to gain entry to their home by telling them that his grandmother had had a stroke. Finally, it was Flamer who told the police that Deputy did not want to accompany Flamer into the Smiths' home, but had to be coaxed by Flamer into doing so. JA at 32. In light of these facts, we do not believe that Flamer has shown, as he must under Strickland, 466 U.S. at 686-87, that in failing to portray Deputy as the instigator, Reardon's assistance fell below an "objective standard of reasonableness ... under prevailing professional norms," id. at 688. Nor do we believe that there is a "reasonable probability" that, but for any errors of his attorney, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Id.

> 2. Reardon's penalty-phase summation was very brief:
>    Good afternoon, your honor. Good afternoon, ladies and gentlemen. I am not going to review the evidence with you. You have heard it and you have heard it rehashed. I simply want to point out to you one important aspect.
>
>    There is a codefendant Andre Deputy. His fate is out of your control. You heard the testimony. You heard Mr. Flamer talk. What part did Andre Deputy play in this? You must consider that in making your determination as to whether or not you are going to take William Henry Flamer's life.
>
>    Other than that, please -- you have heard his mom. You have heard his grandmom. You have the medical reports.
>
>    Ladies and gentlemen, although we are here today talking about murder, I am simply going to ask you to show mercy. Do not kill

51

> William Henry Flamer simply because the law
> and the state of Delaware say you can.  There
> is a far, far greater law than anything
> conceived by this state and punished by this
> State which tells you thou shalt not kill.
> Thank you.

JA at 1486-87.[0]

Flamer argues that this closing argument was constitutionally deficient, not only because of its brevity, but because it was "so ill-conceived that it hurt Flamer's sentencing prospects."  Appellant's Br. at 48.  We disagree.  Although we cannot say that Reardon's closing argument was especially persuasive or well-crafted, we also cannot say it was so poor that it fell below the Strickland standard for objectively reasonable assistance.  Furthermore, we hold that Reardon's failure to present a more effective summation did not prejudice Flamer, for we cannot say that there is a reasonable probability that, but for any errors, the jury would not have imposed a sentence of death.

Reardon was faced with several obstacles that limited his choices in framing a penalty-phase summation.  First, the prosecution had offered virtually no penalty-phase evidence of

---

[0]Though short, Reardon's closing argument in the penalty phase was longer than that of the prosecutor, who stated:

> Ladies and gentlemen, my last remarks are going to be
> very brief.  That same law thou shalt not kill pertains
> to William Henry Flamer.  He had a free choice in this
> matter and the conduct that he took part in.  His free
> choice has brought him here today.  Please be fair.
>
> All the state is asking is you consider all the
> factors in this case before your decision.  Thank you.

JA at 1487.

its own.  Given this, it may have been tactically wise for Reardon not to review evidence presented in the guilt phase of the trial, since this might have only reminded the jury of the violence of the crimes.  Second, although Flamer argues that Reardon should have further emphasized the role of Andre Deputy, such an approach, as previously explained, would have involved certain difficulties.  See pages 41, 51, supra.  Finally and perhaps most importantly, Flamer had denied committing the murders in his testimony during the guilt phase of the trial.  This prior testimony made it very difficult for Reardon to argue in the penalty phase that Flamer felt great remorse for the murders.

One court has remarked that a defense counsel's strategy in the sentencing phase of a capital case should be "to appeal to just one juror who will hold out against the death penalty and thereby prevent it."  McDougall v. Dixon, 921 F.2d 518, 537 (4th Cir. 1990), cert. denied, 501 U.S. 1223 (1991).  Under the circumstances, we believe that Reardon's brief summation, with its plea for mercy and its suggestion that Deputy was more blameworthy than Flamer, was calculated to appeal to a sympathetic juror.  Following Reardon's lengthier opening statement, the testimony of Flamer, and finally, the sad testimony of Flamer's mother and grandmother, Reardon's summation in the penalty phase did not render his assistance constitutionally ineffective.

**IV.**

Flamer argues that a portion of the jury instructions in the penalty phase was unconstitutional because o expanded the impression that appellate review of a decision to impose a sentence of death would be more expansive than is actually the case. In particular, Flamer claims the statutorily required jury instruction was improperly altered by the insertion of the word, "if": "Your unanimous recommendation for the imposition of the death penalty, if supported by the evidence, is binding on the Court." JA at 1464 (emphasis added).

We do not believe the inclusion of the word "if" changed the meaning of this jury instruction at all. The word "if" or some other qualifying preposition is implicit at the beginning of the phrase, "supported by the evidence." Moreover, elsewhere in the instructions the jury was told: "A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on this Court," Id. at 1461. These instructions were not misleading and did not violate the principle, set out in Caldwell v. Mississippi, 472 U.S. 320, 336 (1985), that a jury instruction that inaccurately describes the role of a jury in meting out a death sentence is unconstitutional. See also Dugger v. Adams, 489 U.S. 401, 407 (1989).

**V.**

Finally, Flamer argues that the district court erred in refusing to expand the record to include the criminal record of

54

his codefendant Andre Deputy pursuant to Rule 7 of the Rules Governing § 2254 Cases in the United States District Courts.[0] Rule 7 permits the expansion of a record for relevant evidence. Flamer argues that the evidence is relevant because it bears on the competence of his attorney, who did not present much evidence of Deputy's past during the guilt and penalty phases of the trial. We review the district court's decision on this question for abuse of discretion only. Levine v. Torvik, 986 F.2d 1506, 1517 (6th Cir.), cert. denied, 113 S. Ct. 3001 (1993); Blango v. Thornburgh, 942 F.2d 1487 (10th Cir. 1991); Ford v. Seabold, 841 F.2d 677, 691 (6th Cir.), cert. denied, 488 U.S. 928 (1988).

We do not believe the district court abused its discretion in refusing to expand the record to include evidence regarding Deputy's criminal past, particularly in light of the fact that this evidence was available to Flamer during the state proceedings.[0] Deputy's criminal record would not have aided the district court in determining whether Reardon provided

---

[0] In his brief, Flamer also argued that the court erred in refusing to unseal and admit into the record the results of his attorney's Censor Committee hearing. At oral argument before our court, however, Flamer's attorney stated that the documents had been unsealed, that she had seen them, and that she no longer wished to press for their inclusion. We therefore need not address whether the record should have been expanded to include this information.

[0] Absent extraordinary circumstances, a habeas petitioner may not seek an evidentiary hearing on the basis of records that were available to him during the state court's proceedings but that he did not present. Keeney v. Tamayo-Reyes, 504 U.S. 1, 7–12 (1992). Flamer, who was represented by new counsel during post-conviction proceedings in the Delaware courts, has not shown cause for his failure to request that these records be included at these earlier proceedings. Accord Walker v. Vaughn, 53 F.3d 609, 613 (3d Cir. 1995).

ineffective assistance of counsel.  We therefore hold that it was not an abuse of discretion for the court to refuse to expand the record to include this material.

In addition, Flamer argues that the district court erred in refusing to expand the record to include Deputy's confession, which Flamer argues is relevant to the question of whether Flamer's own confession was admissible.  As discussed earlier, the circumstances surrounding Deputy's statement are distinguishable from those surrounding Flamer's statement.  Moreover, the statement itself has no bearing on whether Flamer's confession was admissible.  Therefore, the court did not abuse its discretion in refusing to expand the record to include Deputy's statement.

**VI.**

For the reasons stated above, the order of the district court will be affirmed.